**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

LEE FOGLE,

       Plaintiff,                                                    Case No.:

vs.

IBM CORPORATION, METROPOLITAN LIFE    **JURY TRIAL DEMANDED**
INSURANCE COMPANY, & IBM
LONG TERM DISABILITY PLAN,

       Defendants.

_____/

**COMPLAINT & DEMAND FOR JURY TRIAL**

Plaintiff, Lee Fogle ("Plaintiff"), by and through his undersigned attorneys,

hereby sues Defendants, IBM Corporation ("IBM"), Metropolitan Life Insurance

Company ("MetLife"), and IBM Long Term Disability Plan (the "Plan") (altogether,

"Defendants"), and in support thereof, respectfully states as follows:

**Nature of the Action; Jurisdiction, Venue, & Parties**

1.     This action alleges claims under Florida and federal law, including

negligent misrepresentation, breach of fiduciary duty, intentional infliction of emotional

distress, negligence, and claims under 29 U.S.C. § 1132(a)(3), of the Employee

Retirement Income Security Act ("ERISA").

2.     Plaintiff is a citizen and resident of Florida and the United States.  Plaintiff

has been employed by IBM since February 2017, and has been an approved claimant of

the Plan, offered and administered by MetLife, since early 2018.

3.     IBM is an entity incorporated in the State of New York, with a principal

place of business in Armonk, New York.

4.     MetLife is an entity incorporated in the State of New York, with a principal place of business in New York, New York.

5.     The Plan is an employee benefit plan, as defined in 29 U.S.C. §1002(3), that is sponsored by IBM, as defined in 29 U.S.C. §1002(16)(B), and administered by MetLife, as defined in 29 U.S.C. §1002(16)(A).

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367, and 29 U.S.C. § 1332(e)(1).

7.     This Court has personal jurisdiction over all Defendants pursuant to the Florida Long-Arm Statute, § 48.193.  IBM and MetLife each conducts business inside Florida state lines, including via sponsoring or administering the Plan, and through multiple branch offices throughout Florida; each also maintains a registered agent in Florida.  IBM and MetLife committed tortious acts and omissions, including in Florida, which caused injury to Plaintiff in Florida, including with respect to benefits due to Plaintiff under ERISA.

8.     Venue is proper in this Court pursuant to each of 28 U.S.C. § 1391(b)(1), and 28 U.S.C. § 1391(c)(1) & (2).

## Facts Common to All Counts

9.     Plaintiff, who is in his early 60s, was a successful executive in the insurance industry for decades prior to his tenure of employment at IBM.

10.     Prior to his employment with IBM, Plaintiff led major sales and marketing divisions at multiple publicly-traded, global companies, including companies ranging in size from $2 billion to $13 billion annual revenues.

11.     Plaintiff began his insurance technology career in 1983; throughout his career, he rapidly advanced in leadership and management responsibilities for large technology companies, including Fortune 100 companies.  As representative examples, Plaintiff (1) frequently led global sales and product organizations in achievement; (2) personally oversaw the design, or collaborated in the original design, of over 20 products for insurance companies, up to and including he and his teams receiving six U.S. patents for their designs; and (3) led product expansions into new geographic markets in at least 14 countries.

12.     In November 2016, IBM began an aggressive recruiting process to hire Plaintiff in an executive position to become the sales leader of IBM's much-touted Artificial Intelligence, Robotics, and Cognitive Process Division.  IBM pitched Plaintiff on a role at IBM in which Plaintiff would leverage his extensive and successful experience in his industry to help IBM achieve what it had never done before:  become a successful brand in the insurance industry, including the lucrative Financial Services-BPO market.[1]  IBM represented to Plaintiff that this entry into the insurance industry would be achieved via investing in the large insurance market, and via hiring Plaintiff and taking the benefit of his extensive industry relationships, experience, and expertise.

a.   IBM had in fact previously sought Plaintiff's counsel, during multiple meetings dating back twenty years, for advice and connections during

---

[1] This had not been for prior lack of trying by IBM.  IBM had experienced disappointing results over the prior 35 years in the insurance industry, and at the time IBM was courting Plaintiff, industry analysts considered IBM, as representative example, a non-presence in the insurance industry technology strategy arena.

earlier efforts to improve its position in the insurance industry and
Financial Services-BPO market.

13.     At the time he was first approached by IBM, in November 2016, Plaintiff
was a key member of executive leadership at Genpact, Inc., a publicly traded entity that
began as part of General Electric.  At that time, Plaintiff was head of North American
Financial Services Sales at Genpact, and was enjoying the fruits of his fantastic track
record at multiple entities in the form of strong Genpact compensation and benefits;
meaningful job security; real opportunities for enhanced duties and pay in the years to
come; and a creative, engaging, respectful work environment.

14.     As he repeatedly told the IBM folks recruiting him in and around late
2016, Plaintiff had no incentive to leave his lucrative position at Genpact, where he could
maximize his earnings to save for retirement before age 65, to go to IBM, or to anywhere
else for that matter (although opportunities to do so were a regular occurrence).

15.     During this dialogue with IBM, Plaintiff was keenly aware that the next
several years were to be the culmination of his career in terms of earnings,
responsibilities, and influence, and that he had set himself up quite nicely at Genpact,
Inc., to enjoy a lucrative, fulfilling final few chapters of his professional life before a
proud, contented retirement.

16.     It took a full-court, multi-month press by IBM to bring Plaintiff around to
the idea of joining IBM.  As part of IBM's courtship process, Plaintiff was interviewed
by two executive recruiters, one headhunter, and five IBM Vice Presidents; as well,
Plaintiff's references were investigated extensively.

17.     IBM convinced Plaintiff to leave Genpact, Inc., and join IBM via a series of representations it made to Plaintiff, including:

    a.   Plaintiff would be given time, space, discretion, and resources to lead and author sales strategies for a particular division, the Cognitive Business/Process Services division, inside IBM in order to achieve a greater foothold for IBM in the insurance industry and Financial Services-BPO market.

    b.   Plaintiff would have the authority to hire and oversee a sales team of his choosing to work for and with him when he arrived at IBM.

    c.   Plaintiff would have responsibility for developing and executing IBM's sales strategies for IBM's Banking, Capital Markets, and Insurance divisions in its Financial Services sector.

    d.   Plaintiff could expect to have at least two years, if not more, to lead and grow his sectors of the Cognitive Business/Process Services division at IBM.

18.     Plaintiff also reviewed and took note of materials provided and/or authored by IBM regarding its compensation and benefits package prior and contemporaneous to deciding to leave Genpact and begin work at IBM – including materials that touted IBM's "competitive" benefits program designed to "support employees [] across all dimensions of health:  physical, mental, social, financial, and purpose."  Plaintiff was aware of similar representations made by IBM at this time touting its "culture" of promoting health and wellness for employees; and he worked with an IBM representative leading up to employment to select his benefits package, which

included disability-related insurance protections recommended to him by that IBM representative.

19.     IBM also offered Plaintiff a signing bonus to immediately join IBM (and immediately provide IBM the benefit of his skills and experience to be applied to ongoing and imminent IBM insurance-related initiatives).  This was offered primarily to offset the loss of hundreds of thousands of dollars of expected forthcoming commissions that would be due to Plaintiff from Genpact if he were to have remained with Genpact.

20.     Plaintiff ultimately determined to join IBM for reasons including the above representations and information, and began work at IBM in February 2017 in the role of IBM Financial Services Sector Sales Leader, Cognitive Business Services, in the IBM Global Business Services division of IBM, in Tampa, Florida.

21.     Quickly after beginning employment, Plaintiff was informed by IBM that, despite its prior representations, he (1) would not be empowered to select and hire a sales force to work with him; and (2) would not have the ability to craft or even oversee sales strategy for the Banking and Capital Markets divisions in the IBM Financial Services sector.  Each of the above ran contrary to what had been prominently, repeatedly, and very recently promised to Plaintiff by IBM during the recruiting process.

22.     During February and March 2017, Plaintiff frequently worked between 80 and 100 hours a week for IBM, although he was not provided the role and resources promised prior to employment.  His efforts and ideas were largely ignored, just weeks after IBM claimed he would feature prominently as a leader in his division.  Moreover, not only was Plaintiff now unable to roster a sales team of his choosing, but IBM

colleagues in his division – individuals with whom he was expecting and had been promised to work – were being terminated by IBM just weeks after Plaintiff's arrival.

23.     Plaintiff quietly made inquiry to return to Genpact within weeks of joining IBM, and learned that his prior employer had already hired two individuals to fill his shoes and run his division.

24.     Plaintiff began suffering physical and psychological distress during February and March 2017, including as a result of IBM-related exhaustion and the impact of IBM's broken promises – within his first two weeks of employment – on this crucial and valuable stage of his career.

25.     When Plaintiff began experiencing certain alarming physical symptoms, including at the workplace, he placed himself under the care of a neurologist and entered IBM's Short-Term Disability Program (the "ST Plan") on March 28, 2017.[2]  Plaintiff's health issues at this time included symptoms manifesting as mental health conditions, which Plaintiff had never experienced or been diagnosed with prior to joining IBM.

26.     Plaintiff was enrolled in the ST Plan, which was administered by a separate IBM division, from March to June 2017.  During that time period, IBM did not appropriately respect boundaries that were or should have been in place and/or enforced via the ST Plan and IBM, including because Plaintiff's colleagues and supervisors at IBM did not consider neurological and mental health issues such as those suffered by Plaintiff at the time truly disabling, and worthy of those boundaries.

27.     Representative examples of the above include:

_____

[2] ST Plan benefits, including benefits paid to Plaintiff during his enrollment period, were, on information and belief, funded out of IBM's general assets.

a. **Plaintiff continued working while enrolled in the ST Plan, with IBM's approval and encouragement**:  IBM repeatedly involved Plaintiff in email and telephone chains and conversations with IBM colleagues regarding workplace initiatives while he was enrolled in the ST Plan between March and June 2017.  Plaintiff felt compelled by IBM to participate in these work exchanges, in fear of losing his position if he did not (including in light of ongoing layoffs at IBM elsewhere in his sector).  Plaintiff spent roughly 35-40 hours a week on IBM business activities, issues, and initiatives during his March-June 2017 tenure in the ST Plan.

   i. At this time, one or more supervisors at IBM – among those contacting and working with Plaintiff on workplace activities, and/or empowered to authorize or forbid such contacts with Plaintiff, while he was enrolled in the ST Plan – made comments expressing skepticism about Plaintiff's disabling mental/neurological conditions, contrary to the diagnosis of a treating medical professional, and despite the fact that Plaintiff was approved to be a part of, and never removed from, the ST Plan at this time.

b. **Plaintiff felt compelled to return to work at IBM before he was ready:**  One byproduct of IBM continuing to involve Plaintiff in work activities during his enrollment in the ST Plan during March-June 2017 was that Plaintiff was being kept abreast of layoffs of

colleagues; flagging division, sector, and IBM initiatives and revenues; and yet another impending new role and supervisor. Plaintiff felt pressured by this news to leave the ST Plan and return to active status at IBM prematurely, in June 2017. IBM allowed, if not tacitly encouraged, this decision, including in the aftermath of a truthful, constructively critical email Plaintiff sent to IBM upper management (while enrolled in the ST Plan) diagnosing substantial problems, inefficiencies, and opportunities in his sector/division at IBM.

    i. Medical and mental health professionals who have worked with Plaintiff confirmed that his decision to resume work at IBM in June 2017 came too soon.

28. In June 2017, Plaintiff returned to active employment status with IBM and exited the ST Plan. He was again provided a new role, title, and supervisor, which resulted in even further diminished powers and authority than what IBM had promised him prior to his decision to leave Genpact.

29. Between June and September 2017, Plaintiff continued best efforts to add value to IBM, despite inconsistent and intimidating contacts with his supervisors, including pretextual "COE" warning letters and conduct such as scheduling and then peremptorily canceling (and failing to reschedule) meetings with Plaintiff – including meetings that involved travel out of state – regarding IBM initiatives to which Plaintiff had been assigned.

30.     Moreover, as the above was taking place, Plaintiff was suffering silently –
continuing to experience the traumatic symptoms and pain from his health issues that had
been aggravated by IBM's callous treatment during and after his tenure as part of the ST
Plan, including via pressure to resume work too soon.  Notably, there was no follow-up
from IBM during summer 2017 to ensure that Plaintiff and his colleagues and superiors
were appropriately responding to and managing his resumption of work activities.  IBM
offered Plaintiff nothing in the way of a post-ST Plan support system; rather, IBM on
Plaintiff's resumption of active employment treated him as someone who, by entering the
ST Plan, had fallen behind and needed to sprint to catch up to the rest of his sector.

31.     In late summer 2017, Plaintiff finally realized that he had returned to work
too soon and needed to resume participation in the ST Plan, and informed IBM Human
Resources in the last week of August 2017 that he was doing so.  This was met with
substantial consternation, as his re-enrollment in the ST Plan apparently interrupted
IBM's plans to fire Plaintiff (just months after representing to him that he would be
provided at least two years to build out IBM's entry into his areas of expertise in the
insurance industry).

        a.   Plaintiff's supervisor even tried to formally terminate Plaintiff after,
and on the very same phone call during which**,** Plaintiff informed him
that he had re-entered the ST Plan.

32.     Between September 2017 and early 2018, Plaintiff remained enrolled in
the ST Plan.  During that time, IBM frequently reminded Plaintiff that he would be
terminated as soon as he recuperated.

33.     Throughout late 2017 and early 2018, Plaintiff did not receive mental health-specific resources for navigating enrollment in the ST Plan and/or seeking enrollment in the Plan on cessation of ST Plan benefits.  Instead, Plaintiff's recovery was frequently infringed on via substantial (and, for Plaintiff in his condition, arduous) paperwork and communication requirements, as well as receipt of wrong and faulty information from IBM to him regarding the ST Plan and Plan, during this crucial time.

34.     Plaintiff also was at times underpaid benefits due to him under the ST Plan while re-enrolled in the ST Plan, which required him to engage in additional follow-up activities to recover funds due from IBM.

35.      Plaintiff's enrollment in the ST Plan concluded according to its terms on or around February 2, 2018, although Plaintiff remained disabled.  IBM, which had previously informed Plaintiff that he would be terminated at earliest opportunity, continued to fail to provide sufficient or consistent resources and communication concerning Plaintiff's application for and transition into the Plan at this time.  These failures contributed to substantial delays in approval by MetLife, the Plan Administrator, of Plaintiff's application for enrollment in the Plan, for which he was eligible in early February 2018, but for which he was not approved by MetLife until on or around April 10, 2018.

36.     During those 65-plus days, Plaintiff was disabled – as diagnosed and confirmed by medical and mental health professionals – and without income or benefits from IBM; this circumstance aggravated and did not arrest Plaintiff's disabling conditions.

37.     In April 2018, MetLife formally approved Plaintiff's enrollment in the Plan, subject to Plan terms limiting his participation to 24 months due to a "mental or nervous disorder or disease" diagnosis, retroactive to February 2018.

38.     From April 2018 to the present day, Plaintiff has remained a part of the Plan.  MetLife has received information and evaluation from medical and mental health professionals – some of whom work directly with Plaintiff, some of whom work with and were sourced independently by MetLife – continuing to support that Plaintiff is disabled – from "his" and from "any" occupation commensurate with his education, training, and experience.

39.     MetLife, during Plaintiff's enrollment in the Plan, determined that Plaintiff's disabling conditions were not preexisting at the time he began employment with IBM.

40.     Plaintiff's formal diagnoses as determined by MetLife and treating professionals include bipolar disorder, major depression disorder, and anxiety disorder. MetLife has determined, and reminded Plaintiff on multiple occasions, that these diagnoses do not entitle Plaintiff to any exclusions from the Plan's 24 month limitation, or cap, on benefits for disabling "mental or nervous disorder[s] or disease[s]."[3]

41.     IBM, despite having materially contributed to the existence of Plaintiff's ongoing disabling conditions, has ultimately reached the same conclusion – that Plaintiff's disability benefits are subject to a 24 month limitation under the terms of the Plan.

---

[3] There is ample scientific evidence, including in the medical and mental health professional community, that bipolar disorder involves an organic chemical imbalance, and includes physically identifiable underdeveloped portions of the brain.

42.     Plaintiff's enrollment in the Plan is set to expire on or around February 4, 2020.  Knowledge of this fact has exacerbated Plaintiff's disabling conditions and impeded his attempts at recovery and health maintenance.

43.     Plaintiff remains disabled as of the filing of this Complaint.

### The Plan & Applicable Law

44.     Plaintiff has previously requested copies of the Plan and governing and summary documents for the Plan.  Each of IBM and MetLife has on multiple occasions instructed to contact the other to request copies of Plan documents.

45.     The Plan includes the following:

   a.   During an employee's first twelve months of enrollment, MetLife reviews for inability to perform one's own job, and thereafter, MetLife determines disability status on the basis of whether the employee cannot perform any occupation with any employer in light of that employee's education, training, and experience.

   b.   Benefits are limited to 24 months in a lifetime for disabling mental health conditions, or "mental or nervous disorder or disease," unless such condition is schizophrenia; dementia; or organic brain disease, in which case benefits are not subject to the 24 month limitation.

      i.   According to the Plan, "Mental or Nervous Disorder or Disease means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic And Statistical Manual Of Mental Disorders as of the date of

Your Disability.  A condition may be classified as a Mental or Nervous Disorder or Disease regardless of its cause."

    ii.    Schizophrenia and dementia each meets the diagnostic criteria set forth in the most recent edition of the Diagnostic And Statistical Manual Of Mental Disorders as of 2017, 2018, and the present.

  c.    The enrolled employee must contemporaneously file an application for SSDI – U.S. Social Security disability insurance benefits – and must appeal a denied application.  Funds awarded under SSDI are to be offset against funds paid under the Plan – in other words, equivalent funds are clawed back by MetLife & IBM.

46.    The Plan is required to comply with all state and federal laws, and with ERISA.

47.    On information and belief, at the time IBM contracted with MetLife regarding the Plan, (1) MetLife designed the proposed terms of the Plan – including the "mental or nervous disorder or disease"-related terms set forth above – specifically and uniquely for IBM's consideration, and (2) IBM had the power and discretion to request revisions to terms of the Plan recommended by MetLife before and after Plan implementation.

48.    On information and belief, MetLife recommended the 24 month "mental or nervous disorder or disease" benefits limitation in the Plan to IBM.

49.    On information and belief, MetLife recommended the "schizophrenia, dementia, organic brain disease" Plan exceptions to IBM.

50.     On information and belief, IBM had the power to accept, reject, or revise these recommendations, including to add bipolar disorder to the above list of exceptions to the 24 month "mental or nervous disorder or disease" cap, as other employers have done in contracting with MetLife.  *See, e.g.*,

https://www.metlife.com/content/dam/metlifecom/us/homepage/justWorks/pdf/Justworks EmploymentGroupLLC_DisabilityPlanDesign.pdf, at 19 (listing "schizophrenia, dementia, organic brain disease" as a standardized – *i.e.*, shaded category – exception to the 24 month cap for "mental or nervous disorders or diseases," but noting also that for this particular client, "bipolar disorder will not be limited").  *See also, e.g.*,

http://www.benefitdesigngroup.com/CareFirst%20Benefit%20Descriptions/EmjayMetLif eLTD.pdf; https://louisville.edu/hr/benefits/long-term-disability/LTDCertificateofCoverageMetLife.pdf.

51.     IBM and MetLife, in jointly fashioning and contracting for the Plan, were required under ERISA to do so, but did not do so, in a manner consonant with all laws of the United States, including as set forth at 29 U.S.C. § 1144(d).

52.     IBM and MetLife, in jointly fashioning and contracting for the Plan, were required under ERISA policy to do so, but did not do so, for the purpose of "increas[ing] the likelihood that participants . . . will receive their full benefits," as set forth at 29 U.S.C. § 1001b(c)(3).

53.     Schizophrenia, dementia, and bipolar disorder are all biologically-based mental illnesses, including as defined, described, and recognized by the State of New York, which is IBM's and MetLife's place of incorporation and principal place of business, and was IBM's and MetLife's place of incorporation and principal place of

business at the time (1) IBM internally debated and determined the type and scope of benefits packages it would offer all IBM employees, including the Plan, in effect at the time Plaintiff joined IBM, and (2) MetLife designed IBM disability plan proposals with recommendations – on which IBM was entitled to rely – regarding appropriate and lawful terms and provisions for what ultimately became the Plan.

    a.  New York Ins. Law § 3221(l)(5)(B)(ii) states:  "[B]iologically based mental illness" means a mental, nervous, or emotional condition that is caused by a biological disorder of the brain and results in a clinically significant, psychological syndrome or pattern that substantially limits the functioning of the person with the illness. Such biologically based mental illnesses are defined as schizophrenia/psychotic disorders, major depression, bipolar disorder, delusional disorders, panic disorder, obsessive compulsive disorders, bulimia, and anorexia."

    b.  Several other U.S. states, as well as insurers (including to be in compliance with state and federal mental health parity statutes), utilize substantially the same definition of "biologically based" mental health conditions, which encompasses bipolar disorder alongside conditions such as schizophrenia that are presently excluded from the "mental or nervous disorder or disease" 24 month cap under the Plan.

54.    The Americans with Disabilities Act, including as set forth at 42 U.S.C. § 12112 *et seq.*, forbids disability-based distinctions – such as exempting some but not all

biologically based mental illnesses from a temporal limitation such as the Plan's 24

month cap – in the Plan.

55.     The Rehabilitation Act of 1973, including as set forth at 29 U.S.C. § 794,

forbids discrimination on the basis of disability by the Plan, which is a recipient of

federal funds via its provisions securing clawback of funds awarded to long-term disabled

IBM employees via SSDI applications, which such employees are mandated to submit in

order to remain enrolled in the Plan.

56.     There is no business or other objective reason to exempt some but not all

biologically based mental illnesses from the Plan's 24 month limitation described above.

57.     There is no business or other objective reason to exempt schizophrenia

and not bipolar disorder from the Plan's 24 month limitation described above.[4]

58.     In light of all of the above, Plaintiff alleges the following causes of action:

<u>**Count I**</u>
**Negligent Misrepresentation, Against IBM**

59.     Plaintiff hereby incorporates the allegations in paragraphs 1 through 36 as

if fully set forth herein.

60.     This cause of action seeks money damages against IBM for negligent

misrepresentation.

61.     Including to induce Plaintiff to terminate his employment with his then-

present employer and come to work at IBM, including as pled at paragraphs 17-19 herein,

IBM made statements concerning material facts to Plaintiff that IBM believed to be true

---

[4] MetLife can and does administer plans similar to the Plan that include bipolar disorder as a "limited benefit exclusionary diagnosis" alongside schizophrenia and the other Plan exceptions.  *See, e.g.*, https://www.paed.uscourts.gov/documents/opinions/14D0250P.pdf, at 14.

but which were in fact false, and which caused Plaintiff to leave his then-present

employer and come to work at IBM.

62.    IBM should have known that these statements were false.

63.    In making these statements, IBM intended or expected that Plaintiff would

rely on them.

64.    Plaintiff justifiably relied on these false statements.

65.    These false statements directly and proximately damaged Plaintiff.

WHEREFORE, Plaintiff demands judgment for actual damages against

Defendant IBM, plus consequential damages, and for exemplary and punitive damages,

and for such other relief as this Court may deem just and proper.

<u>**Count II**</u>
**Breach of Fiduciary Duty, against IBM**

66.    Plaintiff hereby incorporates the allegations in paragraphs 1 through 36, as

if fully set forth herein.

67.    This cause of action seeks money damages against IBM for breach of

fiduciary duty.

68.    In light of the facts and circumstances pled herein, IBM, while Plaintiff

was employed at IBM and enrolled in the ST Plan, was Plaintiff's fiduciary.

69.    IBM knew or had reason to know that Plaintiff had placed his trust and

confidence in IBM with respect to Plaintiff's need and ability to recover and maintain his

health and welfare without disturbance or distraction during his tenure on short-term

disability, including in the manner set forth in the ST Plan itself and governing laws and

regulations, as IBM understood, and including as a result of information published by

IBM that Plaintiff viewed before entering the ST Plan that promoted IBM as holding progressive views as an employer toward disabled employees.

70.     IBM breached its above-described duties to Plaintiff, including by virtue of conduct pled at paragraphs 26-36 herein.

71.     As a result of IBM's breaches of its duties, Plaintiff suffered substantial damages.

WHEREFORE, Plaintiff demands judgment for actual damages against Defendant IBM, plus consequential damages, and for exemplary and punitive damages, and for such other relief as this Court may deem just and proper.

### Count III
### Intentional Infliction of Emotional Distress, against IBM

72.     Plaintiff hereby incorporates the allegations in paragraphs 1 through 36, as if fully set forth herein.

73.     This cause of action seeks money damages against IBM for intentional infliction of emotional distress.

74.     The affirmative, intentional acts by IBM, including as pled at Paragraphs 26-36, during and after Plaintiff's first tenure of enrollment in the ST Plan constitute outrageous conduct against Plaintiff.

75.     IBM, including through supervisory employees of IBM, intentionally and deliberately caused Plaintiff to suffer emotional distress, or, in the alternative, engaged in the conduct pled herein with reckless disregard of the high probability of causing Plaintiff to suffer emotional distress.

76.     Plaintiff suffered, and continues to suffer, severe emotional distress, including difficulty sleeping, panic attacks, anxiety, shame, and depression, and the

outrageous conduct of IBM and its supervisory employees caused this severe emotional distress suffered by Plaintiff.

77.    IBM encouraged and ratified the conduct pled herein.  Supervisory employees at IBM facilitated this conduct by engaging in it directly.  Moreover, each supervisory employee of Plaintiff learned or knew of the conduct against Plaintiff, including as a result of statements made to them by Plaintiff.  None took any remedial action in response, and in fact continued to perpetrate and perpetuate a discriminatory and hostile workplace through their own affirmative acts, which resulted in actual or constructive ratification of the conduct pled herein.

WHEREFORE, Plaintiff demands judgment for actual damages against Defendant IBM, plus consequential damages, and for exemplary and punitive damages, and for such other relief as this Court may deem just and proper.

## Count IV
### Negligence, against IBM

78.    Plaintiff hereby incorporates the allegations in paragraphs 1 through 36, and 68-69, as if fully set forth herein.

79.    This cause of action seeks money damages for negligence against Defendant IBM.

80.    IBM owed Plaintiff duties including the following:  (1) duties of care as his employer, including the duty to provide a safe and secure environment, free of harassment, distraction, or intimidation, for employees disabled on mental health/neurological bases to the point of enrollment in and invocation of short term disability status; (2) the duty to train and retain managers who exercise their supervisory and other powers in a reasonable manner; (3) the duty to design, implement, and maintain

effective training, reporting, and disciplinary processes relating to identifying, preventing, discouraging, and remediating harassment and intimidation of, and related misconduct against, mental-health disabled employees at the IBM workplace; (4) the duty to design, implement, and maintain functional systems of oversight of its supervisors who wielded authority over subordinates like Plaintiff; and (5) fiduciary duties, as incorporated herein.

81.     IBM breached its duties owed to Plaintiff for reasons including:  (1) IBM declined to ensure that the IBM workplace was safe and secure for mental health/neurologically disabled employees, both during enrollment in the ST Plan and on and after resumption of active employment; and (2) IBM declined to design, implement, and maintain effective training, reporting, and recordkeeping processes relating to identifying, preventing, discouraging, and remediating workplace harassment, intimidation, and/or other outrageous misconduct against disabled employees such as Plaintiff – in particular employees enrolled in the IBM ST Plan – including after receiving actual or constructive notice that supervisory employees at IBM were exercising their powers to harass and intimidate Plaintiff, including while he was enrolled in, returning to work from, and attempting to re-enroll in IBM's ST Plan.

82.     The above breaches each and together were direct and proximate causes of the physical and emotional injuries suffered by Plaintiff pled herein.  Moreover, these breaches were so reckless as to constitute a conscious disregard or indifference to the rights, safety, and privacy of Plaintiff and, more broadly, employees and other invitees of IBM.

83.     As a result of IBM's breaches, Plaintiff suffered and continues to suffer substantial injuries.

WHEREFORE, Plaintiff demands judgment for actual damages against Defendant IBM, plus consequential damages, and for exemplary and punitive damages, and for such other relief as this Court may deem just and proper.

## Count V
### Violation of 29 U.S.C. § 1132(a)(3), against all Defendants

84.     Plaintiff hereby incorporates the allegations in paragraphs 1 through 56 as if fully set forth herein.

85.     This is a cause of action for violation of ERISA section 502(a)(3), as codified at 29 U.S.C. § 1132(a)(3), against all Defendants, relating to the Plan.

86.     ERISA Section 502(a)(3) empowers a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter . . . ."  29 U.S.C. § 1132(a)(3).

87.     The Plan meets the definition of an ERISA employee benefit plan, or plan, as set forth at 29 U.S.C. § 1002(3).

88.     Plaintiff is an ERISA participant, as defined at 29 U.S.C. § 1002(7).

89.     MetLife is the Administrator of the Plan, including as the term "administrator" is defined at 29 U.S.C. § 1002(16)(A).  IBM exercises discretionary authority or control over the management of the Plan, including as to its terms and scope, and IBM and MetLife each has discretionary authority or responsibility in the

administration of the Plan, including as to its terms and scope.  Each of IBM and MetLife

is therefore an ERISA fiduciary, as defined at 29 U.S.C. § 1002(14)(A), (21).

90.     Under 29 U.S.C. § 1104(a)(1), Plan fiduciaries must discharge their duties

with respect to the Plan "solely in the interest of the participants and beneficiaries and for

the exclusive purpose of providing benefits to participants and their beneficiaries . . ."

(alterations omitted).

91.     As pled herein, each of IBM's and MetLife's conduct relating to Plan

design and scope, as applied to bipolar disorder, or, in the alternative, biologically based

mental illnesses, violates 29 U.S.C. §§ 1001b(c)(3), 1104(a), 1144(d), as well as

governing anti-discrimination statutes pled and discussed herein.

92.     Plaintiff is entitled to equitable relief under ERISA § 502(a)(3), including

an order reforming the Plan to exclude bipolar disorder, or, in the alternative, all

biologically-based mental illnesses, from the Plan's 24 month benefits limitation for

"mental or nervous disorder or disease," and/or enjoining Defendants from continuing

noncompliance with ERISA, including as to the requirement of Plan compliance with

federal law and ERISA policy, and/or requiring Defendants to pay restitution in the form

of a surcharge or otherwise credit Plaintiff for all ERISA benefits to which he should be

entitled in order to be made whole and to prevent Defendants' unjust enrichment.

93.     Defendants' conduct has caused actual harm to Plaintiff in an amount to

be proven at trial.

94.     Plaintiff brought the above-pled ERISA violations in Plan design directly

and internally to IBM and MetLife.  IBM and MetLife each rejected any suggestion of

altering the terms or language of the Plan, and each informed Plaintiff that no further

discussion would be entertained, as "[t]here is no room for movement here" because Plaintiff's disabling conditions simply fall outside Plan coverage after 24 months under the "standard" terms of the Plan.  IBM and MetLife affirmed that no administrative procedures exist under the Plan for challenging or seeking benefits that fall outside the "standard" terms of the Plan (terms negotiated by and between IBM and MetLife prior to Plan implementation).  For these reasons, as well as because IBM is a material source of the wrongdoing here alleged that triggered Plaintiff's disabling conditions, Plaintiff has appropriately exhausted efforts to utilize internal remedies with the Plan Administrator; or, in the alternative, any further direct and internal appeal by Plaintiff to IBM or MetLife would be futile.

WHEREFORE, Plaintiff demands judgment in the form of an order retroactively reforming the Plan to comply with ERISA and applicable law, and requiring Defendants to pay restitution in the form of a surcharge or otherwise credit Plaintiff for all ERISA benefits to which he should be entitled in order to be made whole and to prevent Defendants' unjust enrichment, and for reasonable attorneys' fees and costs, and pre- and post-judgment interest, as allowed by law, and for such other relief as this Court may deem just and proper.

## Reservation of Rights

Plaintiff reserves the right to further amend this Complaint, upon completion of his investigation and pending further discovery, to assert any additional claims for relief against Defendants or other parties as may be warranted under the circumstances, and as allowed by law.

**<u>Trial by Jury</u>**

Plaintiff requests trial by jury for all counts herein alleged so triable.

Dated:  November 25, 2019                     Respectfully submitted,

LEIGHTON LEIB
Florida Bar No. 011926
lleib@knoxleib.com
**KNOX♦LEIB, PLLC**
420 W. Platt Street
Tampa, Florida 33606
(813) 251-1844

*Attorneys for Plaintiff*

25