UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LEE FOGLE,

    Plaintiff,

v.                                    Case No. 8:19-cv-2896-T-33JSS

IBM CORPORATION, METROPOLITAN
LIFE INSURANCE COMPANY, and
IBM LONG TERM DISABILITY PLAN,

    Defendants.
_____/

**ORDER**

    This cause comes before the Court pursuant to the
Motions to Dismiss the amended complaint filed on February
14, 2020, by Defendants IBM Corporation and IBM Long Term
Disability Plan (Doc. # 32) and Defendant Metropolitan Life
Insurance Company (MetLife). (Doc. # 33). Plaintiff Lee
Fogle responded in opposition to both Motions on March 4,
2020. (Doc. # 36). MetLife filed a reply on March 16, 2020.
(Doc. # 43). For the reasons explained below, the Motions
are granted in part and denied in part.

**I.**    **Background**

    **A.**    **IBM Successfully Recruits Fogle**

    According to the operative complaint, Fogle was "a
successful executive in the insurance industry prior to his

1

tenure of employment at IBM." (Doc. # 26 at 2). In November 2016, while Fogle was still working at Genpact, Inc., IBM began "aggressive[ly]" recruiting Fogle to join IBM. (Id. at 3-4).

Fogle represents that after a "full-court, multi-month press," IBM convinced Fogle to leave Genpact and join IBM. (Id. at 4-5). According to Fogle, he made this decision after relying on representations made to him from November 2016 until February 2017 by an unnamed IBM corporate executive recruiter and an IBM vice president "primarily in Tampa, Florida and New York City, New York." (Id. at 5). Those representations included: (1) that Fogle would be given the "time, space, discretion and resources" to achieve a greater foothold for IBM in the insurance industry; and (2) he would have the authority to hire and oversee his sales team and would be responsible for sales strategies. (Id.). IBM also offered Fogle a signing bonus to offset the loss of "hundreds of thousands of dollars of expected forthcoming commissions" that Fogle would have received had he remained at Genpact. (Id. at 6).

In February 2017, Fogle joined IBM as a Financial Services Sector Sales Leader in the Tampa office. (Id.). However, "[q]uickly after beginning employment," IBM

informed Fogle that he would not, in fact, be empowered to select and hire his sales team, nor would he have the ability to craft or oversee sales strategy within his division. (Id. at 7). Fogle's "efforts and ideas were largely ignored," while IBM failed to provide "the role and resources promised prior to employment." (Id.). In the first two months that Fogle was employed by IBM, he regularly worked between 80 and 100 hours per week and, during this time, Fogle began suffering "physical and psychological distress" due to exhaustion and "the impact of IBM's broken promises." (Id.).

### B.   Fogle Enters IBM's Short-Term Disability Program

On March 28, 2017, Fogle entered IBM's Short-Term Disability Program (STDP). (Id. at 7-8). He was enrolled in the STDP until June 2017 and during this time he was having symptoms "manifesting as mental health conditions." (Id. at 8). According to Fogle, IBM did not "appropriately respect [his] boundaries," instead compelling Fogle to continue working 35 to 40 hours per week while he was enrolled in the STDP and making Fogle feel as though he had to return to work before he was ready. (Id. at 8-9).

In June 2017, Fogle returned to active employment status with IBM. (Id. at 10). At this point, Fogle was given a "new role, title, and supervisor, which resulted in even

3

further diminished powers and authority than what IBM had
promised him." (Id.). Fogle continued working full-time
until September 2017 despite what he calls "inconsistent and
intimidating contacts with his supervisors." (Id.). For
example, Fogle alleges that he was sent "pretextual 'COE'
warning letters" and was made to feel that he had "fallen
behind and needed to sprint to catch up to the rest of his
sector." (Id.). During this time, Fogle continued to suffer
from health issues, which he claims were aggravated by IBM's
"callous treatment" and "pressure to return to work too
soon." (Id.).

Realizing that he had returned to work too soon, Fogle
re-enrolled in the STDP between September 2017 and early
2018. (Id. at 11). He claims that this decision was met with
"substantial consternation," as IBM allegedly had planned
to terminate Fogle's employment. (Id.). He alleges that
during this time IBM continued to "infring[e]" on his
disability leave with work demands and underpaid benefits
due to him under the STDP. (Id.). Fogle's enrollment in the
STDP ended on February 2, 2018. (Id. at 12).

### C.   Fogle Enters IBM's Long-Term Disability Plan

Fogle joined IBM's Long-Term Disability Plan (the "LTD
Plan" or the "Plan") on April 10, 2018. (Id. at 12). During

4

the time between February 2, 2018, and April 10, 2018, Fogle
claims that he was still disabled and without income or
benefits from IBM. (Id.). However, Fogle's enrollment in the
Plan was subject to certain conditions within the Plan,
specifically, the Plan's terms limiting its coverage for
disability due to a "mental or nervous disorder or disease"
to 24 months, retroactive to February 2, 2018. (Id.).

According to Fogle, his formal diagnoses include
bipolar disorder, major depressive disorder, and anxiety
disorder. (Id. at 13). IBM and MetLife have determined that
these diagnoses do not entitle Fogle to any exclusion from
the Plan's 24-month cap. (Id.). Fogle's enrollment in the
Plan was set to expire in February 2020 and, according to
Fogle, he remains disabled. (Id.).

### D.   **The Terms of the LTD Plan**

The Plan designates IBM as the Plan Administrator.
(Doc. # 33-1 at 72). The Plan specifically sets forth both
IBM's and MetLife's fiduciary responsibilities as follows:

| Named Fiduciary | Area of Fiduciary Responsibility |
|---|---|
| MetLife | Provision of full and fair review of claim denials pursuant to Section 503 of ERISA |

| Plan Administrator | All other areas not included above |
|---|---|

(Id. at 26). In addition, the Plan provides that "[t]he fiduciary responsibilities of the named fiduciaries shall be exercisable severally and not jointly, and each named fiduciary's responsibilities will be limited to the specific areas indicated for such named fiduciary." (Id.). The Plan gives IBM the right to amend, modify or terminate Plan terms at its discretion, including "benefits plans, programs, practices or policies." (Id. at 74).

Crucial to this matter, the Plan limits benefits for mental or nervous disorders or diseases as follows:

**4.4.13.  Plan Limitations**
If you are disabled due to a Mental or Nervous Disorder or Disease, your disability benefits will be limited to a lifetime maximum equal to the lesser of:
- 24 months, or
- the maximum Disability Benefit Period.

Your disability benefits will be limited as stated above for **Mental or Nervous Disorder or Disease except for:**

- o schizophrenia;
- o dementia; or
- o organic brain disease.

Mental or Nervous Disorder or Disease means a medical condition which means the diagnostic criteria set forth in the most recent edition of the *Diagnostic and Statistical Manual of Mental*

6

> *Disorders* as of the date your disability begins. A
> condition may be classified as a Mental or Nervous
> Disorder or Disease regardless of its cause.

(Id. at 33).

In the amended complaint, Fogle alleges on information and belief that MetLife "recommended" the 24-month cap and the applicable exceptions to IBM. (Doc. # 26 at 15). Fogle contends that while IBM had the power to reject or revise these recommendations, it did not do so "as other employers have done in contracting with MetLife." (Id.). Thus, Fogle alleges that IBM and MetLife, "in jointly fashioning and contracting for the Plan," created a Plan that violated certain laws of the United States; namely, New York insurance laws, the Americans with Disabilities Act, and the Rehabilitation Act of 1973. (Id. at 16-17).

### E.  **Fogle files the amended complaint**

Based on these allegations, Fogle raises four state-law causes of action against IBM: (1) negligent misrepresentation, (2) breach of fiduciary duty, (3) intentional infliction of emotional distress, and (4) negligence. (Doc. # 26 at 18-22). In addition, Fogle brings one claim against both MetLife and IBM, for violation of ERISA, 29 U.S.C. § 1132(a)(3) (Count V). (Id. at 23-25).

IBM and MetLife have now moved to dismiss the amended

complaint in its entirety, Fogle has responded, and the Motions are ripe for review.

## II.  **Legal Standard**

On a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

On a Rule 12(b)(6) motion, the court is generally "limited to the four corners of the complaint." Speaker v. U.S. Dep't of Health & Human Servs., 623 F.3d 1371, 1379

(11th Cir. 2010) (quoting St. George v. Pinellas Cty., 285
F.3d 1334, 1337 (11th Cir. 2002)). If the motion relies on
matters outside the pleadings, then ordinarily, the court
will convert the motion to one for summary judgment under
Rule 56. Fed. R. Civ. P. 12(d). However, there is an
applicable qualification to the rule. "[W]here the plaintiff
refers to certain documents in the complaint and those
documents are central to the plaintiff's claim, then the
Court may consider the documents part of the pleadings for
purposes of Rule 12(b)(6) dismissal, and the defendant's
attaching such documents to the motion to dismiss will not
require conversion of the motion into a motion for summary
judgment." Brooks v. Blue Cross & Blue Shield of Fla., Inc.,
116 F.3d 1364, 1369 (11th Cir. 1997). On a motion to dismiss
pursuant to Rule 12(b)(6) "[c]ourts may consider ERISA plan
documents not attached to a complaint where a plaintiff's
claims are 'based on rights under plans which are controlled
by the plans' provisions as described in the plan documents'
and where the documents are 'incorporated through reference
to the plaintiff's rights under the plans, and they are
central to plaintiff's claims.'" Surgery Ctr. of Viera, LLC
v. Se. Surveying & Mapping Corp., No. 6:17-cv-754-Orl-40TBS,
2018 WL 922202, at *4 (M.D. Fla. Jan. 31, 2018), adopted by,

No. 6:17-cv-754-Orl-40TBS, 2018 WL 906771 (M.D. Fla. Feb. 15, 2018).

Here, the Court will properly consider the IBM LTD Plan in considering the Defendants' Motions to Dismiss because the Plan is identified and referenced in the amended complaint, it is central to Fogle's claims, and the terms of the Plan are not in dispute.

## III. **Analysis**

### A. **Count I: Negligent Misrepresentation**

Fogle alleges that IBM made certain false representations to him in order to induce him to leave his position at Genpact and begin working for IBM, and that Fogle relied on these statements to his detriment. (Doc. # 26 at 18). IBM argues that Fogle has failed to plead fraud with the requisite particularity because he does not plead the names of any individuals who made the alleged misrepresentations or what IBM gained from the alleged fraud. (Doc. # 32 at 6-8).

For allegations of fraud, including for negligent misrepresentation, a plaintiff must "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b); Linville v. Ginn Real Estate Co., LLC, 697 F. Supp. 2d 1302, 1306 (M.D. Fla. 2010) ("Rule 9(b) applies

to claims for negligent misrepresentation under Florida law because negligent misrepresentation 'sounds in fraud.'"). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1359 (11th Cir. 2006) (internal quotation marks omitted).

Under Rule 9(b), plaintiffs must allege (1) precisely what statements were made in what documents or what oral misrepresentations were made; (2) the time, place, and person responsible for the statement; (3) the content of such statements and the manner in which these statements misled the plaintiff; and (4) what the defendants gained by the alleged fraud. Brooks, 116 F.3d at 1371, 1380-81. In other words, to satisfy Rule 9(b), a plaintiff must establish the who, what, when, where, and how of the fraud. Mizarro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008).

Here, Fogle alleges that between November 2016 and February 2017, an unnamed "IBM corporate executive recruiter and an IBM Vice President" began to "aggressively" recruit

11

Fogle in order to hire him away from his job at Genpact. (Doc. # 26 at 3-6). Fogle said this recruitment took place in Tampa, Florida, and New York City "across each of November 2016, December 2016, January 2017, and February 2017." (Id. at 5). Fogle alleges that these IBM recruiters made the following alleged misrepresentations to him in order to recruit him:

- Fogle would be given "time, space, discretion, and resources to lead and author sales strategies for a particular division . . . inside IBM[.]"

- Fogle would have the "authority to hire and oversee a sales team of his choosing to work for and with him when he arrived at IBM."

- Fogle would have "responsibility for developing and executing IBM's sales strategies" for his particular division.

- Fogle would be given at least two years to "lead and grow his sectors of the Cognitive Business/Process Services division at IBM."

- Fogle was told that IBM had a "competitive" benefits program and a culture of promoting employee health and wellness.

(Id. at 5-6). According to Fogle, none of these representations were true. See (Id. at 7, 10).

These allegations do not meet the requirements of Rule 9(b). For one, Fogle has not alleged who it was that made these representations. While he has alleged that the misrepresentations were made "primarily" by an IBM corporate executive recruiter and an IBM Vice President, IBM is a large, global company. Without more, such as the name of these individuals or other information that could better identify them, such imprecise pleading is little better than saying "IBM made these misrepresentations." Such allegations are too vague for Rule 9(b) purposes. See Travelers Prop. Cas. Co. of Am. v. Charlotte Pipe & Foundry Co., No. 6:11-cv-19-Orl-28GJK, 2012 WL 983783, at *6 (M.D. Fla. Mar. 22, 2012) (explaining that the allegations of misrepresentation were insufficient because the statements were not "attributed to a specific person, but instead to corporate entities"); In re Palm Beach Fin. Partners, L.P., 488 B.R. 758, 776 (Bankr. S.D. Fla. 2013) (holding that plaintiffs failed to satisfy Rule 9(b) in part because they had alleged misrepresentations on the part of the company generally); Drilling Consultants, Inc. v. First Montauk Sec. Corp., 806 F. Supp. 2d 1228, 1234-35 (M.D. Fla. 2011) (finding that

plaintiff alleged fraud claims with sufficient particularity against insurance company where the complaint specifically identified the company's agents who made the statements).

Furthermore, it is unclear from the amended complaint which IBM employee made which of the statements Fogle takes issue with or when in that applicable four-month time span each of the misrepresentations was made.

Fogle argues that this Court should employ a relaxed version of the Rule 9(b) particularity requirement because IBM engaged in a lengthy, multi-act scheme. It is true that Rule 9(b) does not require a plaintiff to allege the time and content of every fraudulent statement in the event of a "prolonged multi-act scheme." United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1314 n.25 (11th Cir. 2002). The relaxed standard permits a plaintiff to plead the overall nature of the fraud and then to allege with particularity certain illustrative instances of the fraud. Burgess v. Religious Tech. Ctr., Inc., 600 F. App'x 657, 663 (11th Cir. 2015). Even under the relaxed requirement, however, a plaintiff is still required to allege at least some particular examples of fraudulent conduct to lay a foundation for the rest of the allegations of fraud. Id.

Here, the allegations in the amended complaint fail to meet even the relaxed standard because Fogle has provided the Court with no illustrative examples that were pled with the requisite particularity. Accordingly, Count I is dismissed.

**B.   Count II: Breach of Fiduciary Duty**

Fogle claims that while he was employed by IBM and enrolled in the STDP, IBM was his "fiduciary" because IBM "knew or had reason to know that [Fogle] had placed his trust and confidence in IBM with respect to [Fogle's] need and ability to recover and maintain his health and welfare without disturbance or distraction during his tenure on short-term disability." (Doc. # 26 at 19).

IBM counters that there is generally no fiduciary duty in the employer-employee relationship. (Doc. # 32 at 9-10). Furthermore, IBM argues that to the extent the alleged fiduciary duty exists as a consequence of Fogle's participation in an ERISA plan, such claim is preempted by ERISA. (Id. at 10 n.2, 15-17).

As an initial matter, Fogle insists that his fiduciary duty claim pertains to IBM's short-term disability plan, the STDP, which is not subject to ERISA. (Doc. # 36 at 11 n.5). For the purposes of this Order, the Court will accept that

15

contention as true and assume that the claim is not preempted by ERISA.[1] See also (Doc. # 33-1 at 73-74).

The Court is mindful that whether a fiduciary relationship existed between the parties is typically a question to be determined by the factfinder and is not appropriate for adjudication at the motion-to-dismiss stage. See Reuss v. Orlando Health, Inc., 140 F. Supp. 3d 1299, 1304 (M.D. Fla. 2015). Here, Fogle has alleged that IBM led him to believe that it held progressive views toward disabled employees, that IBM offered to assist him in navigating his disability via the STDP, that Fogle placed his trust in IBM to do so, that IBM knew or had reason to know that Fogle had placed his trust in IBM, such that IBM knowingly undertook a fiduciary duty toward Fogle. (Doc. # 26 at 8-9, 11); (Doc. # 36 at 11). Whether IBM owed Fogle a fiduciary duty under these circumstances is a matter better resolved on summary judgment.

### C.   Count III: Intentional Infliction of Emotional Distress

Fogle alleges that IBM's actions during and after his first tenure of enrollment in the STDP constituted

---

[1] The Court reserves the right to revisit this ruling should additional information come to light demonstrating that the STDP is, in fact, subject to ERISA.

"outrageous conduct" towards him. (Doc. # 26 at 20). He claims that IBM, through its employees, intentionally or recklessly caused him to suffer emotional distress, from which he continues to suffer. (Id. at 20-21). Fogle clarifies in his response that the "outrageous conduct" perpetrated by IBM included pressuring Fogle to return to work while he was still disabled and then "taunting [Fogle] that he would be fired as soon as he got better and returned to work." (Doc. # 36 at 12).

IBM argues that, even taking the allegations in Fogle's complaint as true, nothing rises to the level of "outrageous conduct" needed to state a claim for intentional infliction of emotional distress. (Doc. # 32 at 10-13). The Court agrees.

Under Florida law, in order to state a cause of action for intentional infliction of emotional distress, the plaintiff must allege: 1) deliberate or reckless infliction of mental suffering by defendant; 2) by outrageous conduct; 3) which conduct of the defendant must have caused the suffering; and 4) the suffering must have been severe. Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 278 (Fla. 1985). As stated in McCarson, the conduct by a defendant must be so "outrageous in character, and so extreme in

17

degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 278-79.

"'Federal courts interpreting Florida law have allowed claims for intentional infliction of emotional distress in the workplace to go forward, where the claims involve persistent verbal abuse coupled with repeated offensive physical contact.'" Artubel v. Colonial Bank Grp., Inc., No. 8:08-cv-179-T-23MAP, 2008 WL 3411785, at *12 (M.D. Fla. Aug. 8, 2008); Lopez v. Ingram Micro, Inc., No. 04-cv-95, 1997 WL 401585, *9 (S.D. Fla. Mar. 18, 1997) (noting that the cases where a plaintiff has successfully alleged a claim for intentional infliction of emotional distress included allegations of "relentless physical, as well as verbal harassment"). Claims of intentional infliction of emotional distress related to employment discrimination cases have been "consistently rejected as failing to meet the threshold burden." Martz v. Munro Regional Med. Ctr., Inc., No. 5:06-cv-422-Oc-10GRJ, 2007 WL 2044247, at *3 (M.D. Fla. July 10, 2007) (citing Florida case law for the proposition that "mere insults, indignities, threats, or false accusations" will not result in liability).

This case does not involve allegations of relentless

verbal and offensive physical contact. Rather, Fogle alleges that his co-workers at IBM made him feel that he must return to work before he was ready, continue to perform work for IBM while on short-term disability leave, and that he was taunted by co-workers both during his leave and upon his return. See (Doc. # 26 at 8-12). While regrettable, this does not rise to the level of "outrageous conduct" that is so "extreme in degree, as to go beyond all possible bounds of decency," as required to state a claim for intentional infliction of emotional distress under Florida law. See McCarson, 467 So. 2d at 278.

Fogle argues in his response that a lesser level of outrageous conduct suffices to state a claim where the perpetrators know the victim to be disabled or particularly vulnerable, citing Doe v. Board of County Commissioners, 815 F. Supp. 1448 (S.D. Fla. 1992). (Doc. # 36 at 12-15). It is worth noting that this Court was unable to locate any other cases that have followed the reasoning of Doe and allowed a claim for intentional infliction of emotional distress to move forward under this theory. Moreover, the allegations in the amended complaint do not rise to the level of the relentless harassment and "malicious pestering" present in Doe. Rather, Fogle alleges that he "felt compelled" to

participate in work exchanges while on short-term disability, IBM supervisors "express[ed] skepticism about [Fogle's] disabling mental/neurological conditions," that he "felt pressured" to return to work prematurely because IBM kept him abreast of news of layoffs and flagging revenues, he was provided a diminished role upon his return to IBM, he received pretextual warning letters, and he was involved in incidents where IBM peremptorily cancelled meetings. (Doc. # 26 at 8-10). This simply does not rise to the level of outrageous conduct under Florida law, even assuming that a lower threshold for such claims exists when the victim suffers from a mental disability.

Accordingly, Count III is dismissed.

### D.   Count IV: Negligence

Fogle alleges that IBM owed him multiple duties, including a duty of care as his employer, duties regarding training, reporting, and discipline of employees, and fiduciary duties. (Doc. # 26 at 21). Further, according to Fogle, IBM breached these duties, which breach was the direct and proximate cause of his damages. (Id. at 22).

IBM argues that Florida law does not recognize Fogle's negligence claim. (Doc. # 32 at 13-15). It argues that the duties Fogle alleges IBM owed him are to "operate its

business in the manner [Fogle] believes appropriate," but no such duty exists under Florida common law. (Id. at 14-15). Even viewing Fogle's claims "charitably" as a general description of workplace discrimination, Florida does not recognize a common-law claim for negligent failure to maintain a discrimination-free workplace. (Id. at 15).

"Under Florida law, it is well settled that to state a claim for negligence a plaintiff must allege the existence of a duty, breach of that duty, causation, and damages. The principle of 'duty' is linked to the concept of foreseeability and may arise from four general sources: (1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." Doe v. Faerber, 446 F. Supp. 2d 1311, 1318-19 (M.D. Fla. 2006) (internal citations omitted). Establishing the existence of a duty arising from the general facts of a case encompasses "that class of cases in which the duty arises because of a foreseeable zone of risk arising from the acts of the defendant." McCain v. Fla. Power Corp., 593 So. 2d 500, 503 n.2 (Fla. 1992).

Fogle argues that IBM owed him a duty under this foreseeable zone of risk theory, as well as the

"undertaker's doctrine," which provides that whenever a party undertakes to provide a service to others, that person assumes the duty to act carefully and not place others in harm's way. (Doc. # 36 at 15). He also argues that he may demonstrate that IBM owed him a duty where he can adequately allege other tortious conduct on the part of IBM. (Id.).

As to the zone of foreseeable risk, Fogle has not directed this Court to any case law in which that doctrine was applied to the actions of an employer vis-à-vis its short-term disability plan. Rather, the Court reads Fogle's argument that IBM had a duty to administer the SDTP in a "reasonably careful manner" as a variant of the undertaker's doctrine. In support of that doctrine, Fogle points this Court to Hogan v. Provident Life & Accident Insurance Co., 665 F. Supp. 2d 1273 (M.D. Fla. 2009). There, the court held that an insured had stated a negligence claim against the holding company of his long-term disability insurer where the holding company's employees adjusted, reviewed, evaluated, handled, and approved or denied his disability insurance benefits. Id. at 1284-85. The court determined that the plaintiff had plausibly alleged that the company breached the "undertaker's doctrine" duty-of-care by failing to evaluate the totality of the plaintiff's medical

22

condition, set goals for claims termination that ignored the merits of the plaintiff's claims, and terminated his benefits solely for financial reasons. Id.

This stands to reason – the holding company in Hogan had undertaken the responsibility to evaluate and adjudicate insureds' claims. It follows that they had a duty to do so fairly and in a way that was not harmful to the insured individuals. Here, IBM offered a short-term disability benefits plan to its employees, the STDP. The Court agrees with Fogle that, having offered this benefit, IBM was under a duty to administer the plan fairly and in a way that would not harm the people participating in the plan.

However, unlike the plaintiff in Hogan, many of the actions Fogle complains of happened outside of IBM's administration of the STDP. For example, Fogle alleges that IBM "did not appropriately respect boundaries" by making Fogle feel as though he had to continue to work during his tenure in the STDP, IBM employees made comments "expressing [their] skepticism about [Fogle's] disabling mental/neurological conditions," put pressure on Fogle to return to work too soon, cancelled meetings without telling him, and threatened to fire Fogle as soon as he returned to work. (Doc. # 26 at 8-11). These might have taken place

while Fogle was enrolled in the STDP and been related to his enrollment therein, but these actions have nothing to do with the way IBM ran the short-term disability program. Rather, these allegations are more akin to allegations that IBM discriminated against Fogle on the basis of his disability. But "Florida does not recognize a common law claim for negligent failure to maintain a workplace free of discrimination." Ayubo v. City of Edgewater, No. 6:08-cv-1197-Orl-31GJK, 2009 WL 113381, at *3 (M.D. Fla. Jan. 16, 2009).

There are other allegations, however, that IBM failed to provide Fogle with "mental health-specific resources for navigating enrollment in the [STDP]" and that he was underpaid benefits due to him under the STDP. (Doc. # 26 at 11). Because such allegations could plausibly come under the umbrella of IBM's duty of care with respect to its administration and management of the STDP, these allegations could plausibly state a claim for negligence against IBM.[2]

_____

[2] As to the "special avenue" claimed by Fogle, the Court notes that the case Fogle relies upon in inapposite.   In that case, the plaintiff brought claims of negligent retention and negligent supervision, which both sound in negligence.   Werner v. Level 10 Mktg., Inc., No. 5:10-CV-258-OC-10KRS, 2011 WL 13295745, at *4 (M.D. Fla. Jan. 24, 2011).   The Werner court went on to explain that "the underlying wrong allegedly committed by an employee in a

Accordingly, Count IV is dismissed in part, in accordance with this Order.

### E.   Count V:  ERISA Violation

Fogle alleges Count V against both IBM and MetLife. (Doc. # 26 at 23-25). He claims that IBM and MetLife are Plan fiduciaries, as that term is defined under ERISA. (Id. at 23-24). He alleges that IBM's and MetLife's "conduct relating to Plan design, management, administration, and scope, as applied to bipolar disorder, or, in the alternative, biologically based mental illness" violates multiple provisions of ERISA. (Id. at 24). Thus, Fogle seeks an order reforming the Plan to exclude bipolar disorder or, in the alternative, all biologically-based mental illnesses, from the Plan's 24-month benefits limitation for "mental or nervous disorder or disease." (Id.). He also seeks restitution in the form of a surcharge or other credit for all ERISA benefits that are owed to him to make him whole. (Id. at 24, 25).

IBM argues that Fogle's claim is not one for violation of the Plan's terms. (Doc. # 32 at 17). Thus, to state a

---

negligent supervision or negligent retention claim must be based on an injury resulting from a tort which is recognized under common law." Id. Fogle is not bringing a negligent supervision or negligent retention claim here.

claim, Fogle must allege that a Plan provision violates ERISA. (Id.). But, according to IBM and MetLife, none of the ERISA provisions that Fogle relies on in the amended complaint provide benefits to Fogle beyond the 24-month limitation in the Plan, nor do they prohibit the Plan from including that limitation. (Id. at 18; Doc # 33 at 9-10).

For its part, MetLife moves to dismiss Count V – the sole count against it – with prejudice for failure to state a claim. (Doc. # 33). MetLife's argument has two prongs. First, it argues that its "limited fiduciary status" did not give rise to a duty because MetLife had no fiduciary role in connection with the drafting of the Plan terms. (Id. at 6-9). MetLife points to the fact that the Plan specifically limits its fiduciary responsibility and discretionary authority to the review of claim denials. (Id. at 6). Second, even if MetLife had any such fiduciary duty, Fogle has failed to allege that MetLife violated any substantive provision of ERISA or any terms of the Plan, for the reasons described above. (Id. at 9-14).

Count V arises under 29 U.S.C. § 1132(a)(3), which provides in pertinent part that a civil action may be brought:

by a participant, beneficiary, or fiduciary (A) to

> enjoin any act or practice which violates any
> provision of this subchapter or the terms of the
> plan, or (B) to obtain other appropriate equitable
> relief (i) to redress such violations or (ii) to
> enforce any provisions of this subchapter or the
> terms of the plan.

29 U.S.C. § 1132(a)(3).

Fogle claims that the Defendants' conduct violates the following provisions of ERISA: 29 U.S.C. §§ 1001b(c)(3), 1104(a), and 1144(d). (Doc. # 26 at 24). Fogle clarifies in his response that he is seeking relief under both a fiduciary-duty theory of relief and for violations of ERISA that are independent of Defendants' status as ERISA fiduciaries. (Doc. # 36 at 18); see also (Doc. # 26 at 24). Specifically, Fogle claims Defendants violated Section 1144(d) by designing and implementing a plan that runs counter to New York state law, the Americans with Disabilities Act, and the Rehabilitation Act of 1973. (Doc. # 26 at 16-17).

### 1.   **Section 1144(d) claim**

Section 1144(d) provides that the ERISA statute shall not be "construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." 29 U.S.C. § 1144(d). Section 1144(a) provides that ERISA preempts state laws as they "relate" to any employee benefit plan

described in ERISA. Id. § 1144(a). The Supreme Court has interpreted Section 1144(d) to mean that a New York state anti-discrimination law was not preempted with respect to ERISA benefit plans insofar as it prohibited practices that were unlawful under federal law. Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 88, 108 (1983). This is because state laws like that one play a significant role in enforcement of Title VII, such that preemption of the state law would "modify" or "impair" federal law. Id. at 100-02. Thus, courts have interpreted Section 1144(d) as an exception to the general ERISA preemption rule. See Id.; see also Morton v. Nexagen Networks, Inc., No. 8:18-CV-386-T-24-MAP, 2018 WL 1899038, at *4-5 (M.D. Fla. Apr. 20, 2018) (denying motion to dismiss where Section 1144(d)'s exception saved plaintiff's age discrimination claim from express preemption under ERISA).

Fogle has not directed the Court to any legal authority stating that Section 1144(d) provides a free-standing cause of action under ERISA. What's more, Fogle is not bringing a claim under New York state law, the ADA, or the Rehabilitation Act. Thus, Section 1144(d) does not support Fogle's ERISA claim.

2.   **Fiduciary Duty claims**

Fogle also argues that he is raising an ERISA claim for violation of Section 1104(a), which deals with ERISA fiduciary duties. See Chao v. Wagner, No. CIV.A.1:07-CV1259JOF, 2009 WL 102220, at *2 (N.D. Ga. Jan. 13, 2009) (finding the well-pleaded allegations in the complaint stated a cause of action for breach of fiduciary duties under Section 1104(a)). Fiduciary duties imposed by ERISA include "proper management, administration, and investment of fund assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest." Ehlen Floor Covering, Inc. v. Lamb, 660 F.3d 1283, 1287 (11th Cir. 2011).

To plead a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that the defendant was a fiduciary with respect to a plan and that the defendant breached a duty that related to matters under the defendant's discretion and control. Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1277 (11th Cir. 2005). Pursuant to ERISA, a defendant is a "fiduciary" of a plan "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management

29

or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

"In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." Pegram v. Herdrich, 530 U.S. 211, 226 (2000); see also Herman v. NationsBank Tr. Co., 126 F.3d 1354, 1365 (11th Cir. 1997) ("If a person does not have discretion or exercise authority or control in a given situation, he does not meet the definition of a fiduciary.").

Here, Fogle alleges that MetLife and IBM breached their fiduciary duties in two respects: Plan design and Plan administration. (Doc. # 26 at 24; Doc. # 36 at 17).

The Court will discuss Plan design first. Fogle argues that MetLife "formulated and recommended to IBM a particular design for the [LTD Plan that violated ERISA]" by "subjecting some but not all of a single cluster of biologically based mental illnesses to a benefits cutoff

30

date." (Doc. # 36 at 17). Thus, Fogle claims that the exclusion of certain disorders, like schizophrenia, but not others, like bipolar disorder, from the benefits cut-off date was arbitrary and capricious. (Id. at 17-18).

"[I]t is well-established that an employer's decisions regarding whether, how much, and to whom to provide benefits, known generally as 'plan design' decisions, do not fall within the scope of the defined functions of an ERISA fiduciary, and thus that an employer can make such decisions without being subject to liability for breach of fiduciary duty under ERISA." Burns v. Rice, 39 F. Supp. 2d 1350, 1356 (M.D. Fla. 1998) (citing Lockheed Corp. v. Spink, 517 U.S. 882, 890, 891 (1996)). Here, Fogle essentially dislikes how the Plan was constructed to include bipolar disorder within the 24-month lifetime maximum benefit for mental or nervous disorders or diseases. But "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995). Rather, ERISA gives employers "large leeway to design disability and other welfare plans as they see fit." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 823 (2003). As a corollary to this idea, ERISA generally precludes

courts from changing a plan's terms. "The statutory language speaks of '**enforcing**' the 'terms of the plan,' not of changing them." CIGNA Corp. v. Amara, 563 U.S. 421, 435-36 (2011) (emphasis in original; brackets omitted).

Thus, to the extent Fogle seeks to bring a claim against MetLife or IBM for breach of fiduciary duty with respect to the initial design of the Plan, such a claim must be dismissed. See Lockheed Corp., 517 U.S. at 887 ("Nothing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan.").

Fogle also claims that MetLife and IBM worked together to jointly implement and administer the Plan which "is comprised of terms that have discriminated against and caused damage to [Fogle], whose disability is among those arbitrarily tethered to a 24 month benefits cutoff date while similar disorders, such as schizophrenia, are not." (Doc. # 36 at 17). While administration of an ERISA plan is a recognized fiduciary duty, see Ehlen Floor Covering, 660 F.3d at 1287, Fogle's amended complaint as currently drafted contains no allegations that IBM or MetLife violated their duties with respect to administration of the plan. See Varity Corp. v. Howe, 516 U.S. 489, 502 (1996) ("The ordinary

trust law understanding of fiduciary 'administration' of a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents."). Rather, the allegations make plain that IBM and MetLife administered the Plan in accordance with its terms by enforcing the 24-month cap on non-excluded mental or nervous diseases and disorders. While Fogle does not like this limitation within the Plan, there is currently no allegation within the amended complaint that IBM or MetLife acted arbitrarily or capriciously in administering the terms of the Plan.

However, as Fogle will be allowed leave to file an amended complaint, he may use this opportunity to clarify his allegations regarding whether and to what extent IBM and/or MetLife breached their fiduciary duties under ERISA with respect to their administration or management of the Plan. Accordingly, Count V is dismissed.

## IV.  <u>Conclusion</u>

Generally, leave to amend should be freely given, unless amendment would be futile. <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>Hall v. United Ins. Co. of Am.</u>, 367 F.3d 1255, 1262 (11th Cir. 2004). Here, it is appropriate to allow Fogle leave to amend in accordance with this Order.

Fogle is cautioned that, if he chooses not to allege an ERISA violation in his second amended complaint, he must include allegations supporting this Court's exercise of diversity jurisdiction.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendants IBM Corporation and IBM Long Term Disability Plan's Motion to Dismiss (Doc. # 32) and Defendant Metropolitan Life Insurance Company's Motion to Dismiss (Doc. # 33) are **GRANTED** in part and **DENIED** in part.

(2) Plaintiff Lee Fogle may file a second amended complaint consistent with this Order within 14 days.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 15th day of April, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE